JASPER W. STONE & others, trustees, & others, *vs.* JOSEPH STONE, trustee, & others.

Middlesex.	March 14, 15, 1901. — October 17, 1901.

Present: HOLMES, C. J., LATHROP, BARKER, HAMMOND, & LORING, JJ.

*Evidence*, Admission.  *Deed*, Construction.

One who claimed under a deed of release, wishing to show that it conveyed a certain lot of land belonging to the grantor which was not expressly described in it, testified as follows : "I showed him [the grantor] that release, and asked him what it meant, and he said, 'I don't know.' I said, 'That is your signature.' He said, 'Yes,' and I said, 'You made it out,' and he said, 'Yes, I made it out,' and then said, 'I don't remember about it.'" It appeared that at this time the grantor seemed to be failing and his memory to be very poor.  *Held*, that the evidence did not warrant a finding of a master, that when the deed was shown to the grantor "he did not attempt to repudiate it or deny that it applied to the property" which was the subject of the suit, as there was nothing in the evidence which showed that the question, whether the release applied to the land in dispute, was ever presented to the mind of the grantor.

In the case of *Gerrish* v. *Gary*, 120 Mass. 132, the true boundary on the southeast of the "Penny Ferry lot" in Charlestown, mentioned therein and in this case, was not in issue, and for that reason it may be doubted whether the statement by the court in *Gerrish* v. *Gary* as to that boundary line is decisive of the rights of the parties to that suit; but, however that may be, neither Amos nor Phineas Stone, whose rights were involved in the present case, was a party to *Gerrish* v. *Gary* or concluded by the decision therein, if it can be taken as concluding anybody as to the southeasterly boundary line of the "Penny Ferry lot."

In 1860 and thereafter two brothers P. and A. held each one undivided quarter of certain land. J. the son of P. acquired a mortgage on this land. In 1891 P. died leaving his interest to J. Four years later J. produced an unrecorded release from A. to P. dated February 1, 1880, by which he contended that A. had conveyed to P. all his interest in the land.  J. recorded this release in 1895, and entered to foreclose his mortgage. In 1896 A. died, and thereafter his heirs brought a bill against J. to redeem from the mortgage. J. set up the release of February 1, 1880, in defence to the bill. The release, after referring to a deed of other land not material, referred to a certain deed from one G. to A., the grantor, dated December 19, 1854, and continued as follows: "Now therefore the said P. did verbally agree to and with A. now of said Everett that if he the said A. would pay one half of the purchase money with all other incidental expenses connected with said parcels, and pay one half the costs of all improvements connected with or on said parcels he would convey to him an undivided half part of his interest in the same, I, the said A., having failed in every particular to perform my part of the conditions to be done and performed by me to entitle me to the same do hereby absolutely release all my right, title and interest in and to said parcels of real estate that I may have acquired in any way whatever, and I do hereby remise, release and quitclaim unto the said P.

and his heirs and assigns and do absolve him from all obligations under his promise." There was a deed from G. to A. dated December 19, 1854, but it did not convey the land in question. The mortgaged land was conveyed by another deed from G. to A. dated June 1, 1854, and was not named in the release. It appeared, that the recitals in the release were not in accordance with the facts; also, that after the date of the release no change was made in the treatment of the property and that after that date as before A. was treated as the owner of a one quarter interest in the land, for eleven years during which P. lived, and for four years after P.'s death during which P.'s clerk was living, and that in 1891 J. in a letter to certain park commissioners offered to sell the land, stating that he was duly authorized by the owners, P. one quarter interest, A. one quarter interest, and two others mentioned. *Held*, that the release of February 1, 1880, if it ever took effect at all, applied to the land conveyed to A. by the deed of December 19, 1854, and not to the land sought to be redeemed from the mortgage, which was conveyed to him by the deed of June 1, 1854.

BILL IN EQUITY to redeem from a mortgage certain land partly in that part of Boston called Charlestown and partly in Everett, filed in the Supreme Judicial Court July 13, 1898.

The case was heard by *Hammond*, J., upon a master's report and exceptions thereto. The justice after stating his rulings upon the exceptions to the master's report made the following memorandum of decision :

" I find that the deed from the city of Charlestown to John Gary, dated December 19, 1854, was given for the purpose of releasing certain land and flats which formerly belonged, or were supposed to belong, to the Penny Ferry, and which were not included in the first deed; and the description was broad enough to cover such land, whether situated in Charlestown or in Malden (now Everett), or partly in each, and was intended to cover such land, whether it was wholly in either Charlestown or Malden (now Everett), or partly in each. And I further find that at the time of the delivery of this second deed to Gary, and in all the subsequent conveyances, all parties supposed that there was such land situated a part in Charlestown and a part in Malden (now Everett), and had reason thus to suppose.

" I do not find, therefore, in the release of February 1, 1880, any conflict between the description of the second parcel and the reference to the deed of December 29, 1854; and I rule that the release does not relate to the land named in the first deed to Gary.

" I find that Amos Stone, at the time of his death, was the owner of one quarter of the land in controversy, subject to the

mortgage held by the defendant Joseph Stone, and that his representatives are entitled to redeem. They must pay the whole sum due upon the mortgage if the defendant insists, for they cannot compel him nor the other owners to join in the redemption. There is to be a decree accordingly for the plaintiffs."

A decree was entered for the plaintiffs; and the defendants appealed. The material portions of the findings of the master and of the evidence reported by him are stated in the opinion of the court.

*T. Hunt,* (*F. M. Forbush* with him,) for the defendants.

*A. F. Means,* (*G. R. Blinn* with him,) for the plaintiffs.

LORING, J. This is a bill in equity to redeem from a mortgage certain land lying partly in the Charlestown District of the city of Boston and partly in Everett. The land was bought in 1854 from the city of Charlestown by Phineas and Amos Stone and three other persons named Gary, Howland, and Sewall. The interests of the several purchasers were originally — Gary, one quarter; Howland, one quarter; Sewall, Phineas and Amos Stone, one sixth each. In 1860, Howland sold his one quarter interest to Phineas and Amos Stone and Sewall, and thereafter each of the remaining purchasers, namely, Gary, Sewall, and the two Stones, had each of them one undivided quarter interest in the land.

The land was originally paid for by a mortgage back to the city of Charlestown for the whole purchase money, one half of which was due in five years and the other in ten years. The half due in five years was paid at maturity, in June, 1859; the other half, amounting to $11,919.75, is still unpaid. In June, 1891, the defendant, Joseph Stone, became the purchaser and assignee of this mortgage.

Phineas and Amos Stone were brothers. Phineas died in August, 1891, leaving the defendant Joseph Stone, his oldest son, his residuary legatee and devisee. About four years after his father's death, Joseph produced a release from Amos to Phineas Stone, dated February 1, 1880, which he said he had just found among his father's papers, and claimed that by it Amos had conveyed to Phineas all his interest in the land in question. The release was throughout in the handwriting of Amos Stone, and had never been recorded. Acting on this

claim, Joseph recorded the release on May 31, 1895, and on July 13, 1895, entered to foreclose the mortgage assigned to him in June, 1891; he now refuses to allow the heirs of Amos to redeem.    Amos died in February, 1896, seven months after Joseph entered to foreclose.    This bill is brought to assert the rights of Amos' heirs in the premises.

One Abby M. Andrews, who was the clerk of Phineas during his lifetime, was coexecutor with Joseph under Phineas' will. She told Joseph that Amos owned one quarter of the property in question, and in the inventory of the estate of Phineas Stone it was stated that he owned one quarter of this property and not one half of it.    Abby Andrews died two months before the release dated February 1, 1880, was recorded.    Joseph was unable to testify definitely as to the time when he found this release, but it was shortly before it was recorded.

It appears that no change was made in the division of the net income of the property after the date of the release of February 1, 1880, but that after that date, as before it, one quarter of the net income was paid to Amos; and this continued for the eleven years after the date of the release during which Phineas was alive and during the four additional years after his death until his clerk, Abby M. Andrews, died, making fifteen years in all. Joseph's story is that he found the release among some papers in an ordinary docket box on his desk; that the box and the papers had been there since they were taken out of the safe where they were kept by Phineas, and handed to him by Miss Andrews in 1891, and that he had examined these papers several times before 'he found out what the purport of this release was.

When this estate was purchased from the city of Charlestown, the title to it was taken in the name of Gary.    At that time, all the purchasers except Gary were members of the city government of Charlestown, and the defendant in his brief admits that " possibly " this was the reason for none of the purchasers except Gary appearing as grantees.    Gary held the title for one year, namely, until June, 1855, when he conveyed to Howland the legal title to his (Howland's) one quarter interest; and one year later, namely, in May, 1856, he conveyed to Phineas Stone the legal title to the one undivided half of the estate bought by

Sewall, Amos Stone, and himself. Two months later, namely, in July, 1856, Phineas conveyed to Sewall his one third of the one half which had been conveyed to him, Phineas, by Gary.

When Howland sold his one quarter interest to Sewall and the two Stones, in 1860, he conveyed the legal title to it to Amos Stone. Three years later, in October, 1863, Amos conveyed one third of this one quarter to Sewall and one third to Phineas.

These are the only deeds on record, and the defendant now claims, not only that Amos conveyed to Phineas all his interest by the unrecorded release dated February 1, 1880, but also that all the interest Amos had at that time to convey was an undivided one twelfth interest, namely, the interest which was left in him, Amos, under the conveyance to him by Howland of Howland's one quarter interest after Amos had conveyed away one third of that one quarter to Phineas and the same interest to Sewall.

The master found that Amos had one quarter interest before he executed the release of February 1, 1880, and ruled·that that interest passed to Phineas by virtue of that release. The presiding justice affirmed this finding as to the one quarter interest, but ruled that the release did not apply to the land in question at all, and entered a decree allowing the plaintiffs to redeem.

The finding that Amos, after 1860 and prior to February, 1880, had one quarter interest was right.

In the deed from Amos to Phineas by which Amos conveyed to him his (Phineas') one twelfth interest which Phineas bought of Howland, the legal title to which had been conveyed to Amos by Howland at the time of the purchase three years before, it is stated that Amos conveys " one undivided third part of the several parcels of land flats and rights pertaining thereto, situate," etc. (describing the land in question, among other parcels) ; the deed then continues as follows : " meaning and intending hereby to convey to said Phineas J. Stone so much of said parcels and rights that was conveyed to me by said Howland as aforesaid, as will make him the said Phineas J. Stone together with what was conveyed to him by John Gary by deed dated May 1, 1856 recorded as above Book 751, Page 274, the owner of one undivided fourth part of the several parcels of land, flats and rights

that were conveyed to said John Gary by the City of Charlestown," by two different deeds, which are there mentioned. The reason for there being two deeds from the city of Charlestown to Gary will be explained later on. There was a similar clause in the deed by which Amos Stone, on the same day, conveyed to Sewall his third of the one quarter which had been conveyed by Howland to Amos Stone. This deed from Amos to Phineas is a statement by Amos, acquiesced in by Phineas (by accepting, and holding under, the deed), that the interest of Phineas in the land at that time was such, that if one third of one quarter, namely, one twelfth, were added to it, he would have one quarter; that is to say, it was a statement that Phineas then had one sixth. If Phineas, between May, 1856, when he got the legal title to the one undivided half owned by himself, Sewall, and Amos in equal shares, and the date of this deed from Amos to Phineas, namely, October, 1863, had conveyed to Amos his one third of that one half, Phineas would have had at the date of the deed from Amos to him one sixth, as it is indirectly stated in that deed he then had. And we are of opinion that, on all the evidence in this case, it must be found that such a deed was made by Phineas to Amos, and was subsequently lost.

If such a deed had been made, it is not improbable that Amos would not have recorded it. It is evident that these purchasers arranged the subsequent conveyances between themselves so that the fact, which they concealed at the outset, would remain hidden, namely, the fact that they, while members of the city government of Charlestown, had sold this tract of land to themselves and Gary. It is evident that it was for this reason that Gary held the whole legal title for a year and then conveyed one quarter to Howland; and that it was not until a year after that, that is to say, two years after the purchase was made, that Gary conveyed one half to Phineas; and not until two months after Phineas got this one half, that he conveyed one sixth to Sewall; and again, when in October, 1860, six years after the original purchase, Howland sold his one quarter to Phineas, Amos, and Sewall, it was evidently for this reason that a conveyance of the whole one quarter was made to Amos, and that it was not until three years after that, namely, in October, 1863, that Amos dared to convey to Phineas and Sewall their shares of this one

quarter. If the original verbal agreement under which the purchase was made was carried into effect, Amos had from Phineas a deed of one third of the one half conveyed to him by Gary; and, as we have said, if such a conveyance was made, it was not improbable, for the reasons we have stated, that it was not recorded.

In addition to this, it appears that for thirty-five years, namely, from 1860 to 1895, Amos received one quarter of the net income of the estate, and in the settlements of the income which were made was recognized by all interested, time and again, as owning one quarter of the property. One piece of evidence in this connection is of sufficient importance to be singled out and stated at length: In February, 1891, six months before. Phineas died, this very defendant, Joseph Stone, wrote a letter to the park commissioners of the city of Boston, in which he said that he was " duly authorized by the owners, Phineas J. Stone, one-quarter interest; Amos Stone, one-quarter interest; heirs of Moses B. Sewall, five in number, one-quarter interest; heirs of John Gary, five in number, one-quarter interest," to offer a portion of this land for sale to them, and did offer to sell it to them on terms therein stated. And finally, it was not until four years after Phineas died and two months after the death of Phineas' clerk, that the claim was made that Amos did not own one quarter. In view of all these facts, we are of opinion that the statement in the deed from Amos to Phineas, dated October 6, 1863, that Phineas had one sixth interest prior to the date of that deed, must be taken to be correct, and that such a deed from Phineas to Amos was made, and subsequently lost.

The defendant relies in this connection on the finding of the master that " Joseph showed this deed [of February 1, 1880] to Amos, who did not attempt to repudiate it or deny that it applied to the property which is the subject of this suit." The defendant, Joseph Stone, testified that within a short time after he found the release of February 1, 1880, " I showed him that release, and asked him what it meant, and he said, ' I don't know.' I said, ' That is your signature.' He said, ' Yes,' and I said, ' You made it out,' and he said, ' Yes, I made it out,' and then said, ' I don't remember about it.' " Later this defendant testified that this was in May, 1895. Amos died in February, 1896.

The contention founded on this finding of the master is answered by the testimony of this same defendant that " For several years before his death he [Amos] seemed to be failing. His memory seemed to be very poor. Many things to which I called his attention he could not tell anything about. It got so bad finally that the trustees of the bank had to elect a new president." There is nothing in the evidence which shows that the question whether the release of February 1, 1880, did or did not apply to the property, which is the subject of this suit, was ever presented to Amos' mind, and the master's finding that he never denied that it did apply to it is not warranted by the evidence; he always claimed that he owned one quarter. If he did own one quarter in 1895, the release of February 1, 1880, either did not apply to the locus or it never took effect at all.

The defendant also relies in this connection upon the release dated February 1, 1880; he relies on that release, not only as a conveyance of Amos' one quarter interest, but also as a statement that Amos never became entitled to any part of the one half conveyed to Phineas by Gary, and for that reason that it cannot be found as a fact that a deed for one sixth interest was made and has been lost; and he contends that this should control the facts which we have referred to.

This contention cannot be disposed of without a full consideration of the release dated February 1, 1880, and we shall now consider that release with respect to both aspects of it, which we have just stated.

The release recites that whereas P. J. Stone " is possessed of a certain parcel of real estate situate on Medford Street," in the Charlestown District of the city of Boston, describing it, and "also one other parcel of land situate partly in the town of Everett, in the County of Middlesex and Commonwealth aforesaid, and partly in said Charlestown District, conveyed to him [Phineas J. Stone] by John Gary of said Charlestown District, being an undivided half part of the estate conveyed to said Gary by the City of Charlestown by deed dated December 19, 1854, recorded in Middlesex Registry, So. District, Book 701 Page 12. Now therefore the said P. J. Stone did verbally agree to and with Amos Stone, now of said Everett that if he the said Amos Stone would pay one-half of the purchase money

with all other incidental expenses connected with said parcels, and pay one half the costs of all improvements connected with or on said parcels he wood [*sic*] convey to him an undivided half part of his interest in the same, I, the said Amos Stone, having failed in every particular to perform my part of the conditions to be done and performed by me to entitle me to the same do hereby absolutely release all my right, title and interest in and to said parcels of real estate that I may have acquired in any way whatever, and I do hereby remise, release and quitclaim unto the said P. J. Stone and his heirs and assigns and do absolve him from all obligations under his promise."

The defendant contends that the verbal promise referred to in this release was the promise to hold for Amos one third of the one half conveyed to Phineas by Gary, and that this is a statement by Amos that he had failed to pay his share of the original purchase money and of the subsequent improvements made on the premises, and, as has been said, that the deed operated, not only to release Phineas from his verbal promise as to the one third of the one half, but also to convey to him (Phineas) the one twelfth left in Amos under the deed of one quarter to him from Howland after he had conveyed one third of that one quarter to Phineas and a like interest to Sewall.

" The estate conveyed to said Gary by the City of Charlestown by deed dated December 19 1854 recorded in Middlesex Registry, So. District, Book 701 Page 12," mentioned in the release of February 1, 1880, was not the land which the plaintiffs seek to redeem in this bill. The land which the plaintiffs seek to redeem is that described in the deed from the city of Charlestown to Gary, dated June 1, 1854, and acknowledged June 26, 1854, being the same premises described in the mortgage of the same date from Gary to Charlestown to secure his two notes of $11,919.75 each. The land conveyed by the city of Charlestown by the deed dated December 19, 1854, was in addition to that conveyed by the deed of June 1, 1854. The land conveyed by the deed of June 1, 1854, consisted of five parcels on the westerly side of Malden Bridge on the northerly bank of the Mystic River, and were situate in part in Everett and in part in the Charlestown District of Boston; and of one parcel lying on the east side of Malden Bridge. According to the plan

annexed to the master's report and marked "Tracing of Plan by Thomas Doane," the five parcels on the west of the bridge contained in all between fifty-five and fifty-six acres and the parcel on the east of the bridge contained one and one fourth acres. The land on the east of the bridge is marked on that plan, "Old Penny Ferry Way," and by the description of that lot given in the deed, it is bounded on the southeast by a line therein described, which was then the boundary line between Charlestown and Malden, and is now the boundary line between Boston and Everett; the other boundaries of the "Old Penny Ferry Way" shown on said plan are on the southwest the line of low water and on the northwest by the bridge. This is the same "Penny Ferry Way" that was before this court in *Gerrish* v. *Gary*, 120 Mass. 132. That case and all the papers in it were put in evidence in this case, and are now before us.

The additional conveyance from the city of Charlestown to Gary made by deed dated December 19, 1854, came about in the following way: On August 8, 1853, Gary made a petition to the city of Charlestown, in which he stated that he was "desirous of purchasing of the city, all that part of the Alms House Estate, lying on the east side of the road, also, the flats upon the west side of the road, or such part of the same as the City Council may be disposed to sell." The land originally conveyed to Gary by the deed of June 1, 1854, was part of the almshouse estate of the city of Charlestown. In pursuance of that petition, the city of Charlestown, by deed of December 19, 1854, recorded Book 701, Page 12, being the deed referred to in the release of February 1, 1880, conveyed to Gary for a nominal consideration "all the right title and interest which said City has in and to the land and flats which formerly belonged to the Penny Ferry which lie easterly of and adjoining to Malden Bridge and the streets and abutments leading thereto and southerly of the following described line, [then follows a description of the southeasterly boundary line of the Penny Ferry lot as conveyed by the deed of June 1, 1854] meaning and intending to quitclaim to said Gary all the land and flats if any there be, which formerly belonged to said Penny Ferry situated southerly of said line above described and easterly of said Bridge and the said

A portion of the plan referred to as "Tracing of Plan by Thomas Doane" reduced.

Copy Plan C. referred to in the text reduced.

abutments and streets which is not included in said deed from said City of Charlestown to said Gary."

A consideration of what the Penny Ferry consisted of makes the purpose of this deed plain.

In 1640, Charlestown "established, and for more than a century afterwards maintained, a ferry at this place, known as Penny Ferry. In 1648 the town ordered ' the ways to be made passable for people to go to the boats at the low. water mark,' and. that there should be a causeway made at the ferry." *Gerrish* v. *Gary*, 120 Mass. 132, 133. J. F. Fuller testified, in *Gerrish* v. *Gary*, that in 1858, he assisted his father, S. P. Fuller, in making a survey of the premises; that the old causeway of the Penny Ferry was then visible, and that it extended one hundred and one feet below low water mark. This is shown on Plan C, admitted in evidence in this case as the plan made by S. P. and J. F. Fuller, referred to in *Gerrish* v. *Gary*. It may be assumed that this extension of the Penny Ferry causeway below low water mark was made in pursuance of the order made by the town in 1648, directing " the ways to be made passable for people to go to the boats at the low-water mark," and that the extension was used for landing passengers at low tide by bringing the ferry-boat alongside this extension of the causeway when the tide was out. The maintenance of this causeway, even below low water mark, gave to the owner a prescriptive title, at least to the causeway, even as against the Commonwealth. *Nichols* v. *Boston*, 98 Mass. 39. It was not until 1867. that the present statutory provision prohibiting the obtaining of a prescriptive title against the Commonwealth to flats below low water line was enacted. St. 1867, c. 275. Pub. Sts. c. 196, § 11. It is evident that one of the purposes of this conveyance was to convey to Gary the title of the city to the flats covered by the causeway below low water mark. This conveyance was followed by a grant from the Legislature to build a wharf over ninety-six of these one hundred and one feet; St. 1856, c. 111; and it appears that in the years 1857 and 1858 a pile wharf was built on these flats, by the five purchasers, extending ninety-six feet beyond the end of the Penny Ferry lot mentioned in the deed of June 1, 1854. These flats were north of the boundary line between Charlestown and Malden, were wholly in Charlestown, and passed to Gary under the deed of December 19, 1854.

Whether the grantee of that deed took any right, title or interest to flats in what was then Malden and is now Everett, that is to say, to flats on the southeasterly side of the southeasterly boundary line of the Penny Ferry lot, as described in the deed of June 1, 1854, is not so clear. But the defendant Stone and the others now holding the title conveyed to Gary by the deed of December 19, 1854, claim that the title to flats lying southeasterly of that southeasterly boundary line did pass ; and further, they claim that they now own the same. The origin of the title to these flats was stated by the defendant Joseph Stone at a view of the premises taken by the master; he stated that he and his associates " claimed titles, rights, or easements in the land or flats on the easterly side of the parcel colored green, [the Penny Ferry Way lot is colored green on Doane's plan,] claiming that these titles, rights, or easements had been acquired through adverse possession by the owners of locus using the flats at the ends and sides of the wharf (which covered parcel colored green) [*sic*], to lay vessels for the purpose of loading and unloading them."

The claim to ownership of these flats now made by the defendant Stone and his associates was made when the Metropolitan Sewerage Commission took about half an acre of them, lying in the town of Everett on the southeasterly side of the boundary line between Boston and Everett. On this land being taken, the defendant, Joseph Stone, claiming to own one undivided half interest therein, and the heirs of Gary and Sewall, claiming to own one quarter interest each, brought a petition stating that the flats were owned by them in fee, and asking to have their damages assessed and paid. The defendant, Joseph Stone, claims that the decision in *Gerrish* v. *Gary* is fatal to the theory of the plaintiff that the deed of December 19, 1854, covered flats southeasterly of the Old Penny Ferry lot, and he bases this contention on the ground that " that case expressly decides (both Amos and P. J. Stone being parties) that the boundary line upon the east " is the line of the old Penny Ferry lot, and is the line described in the deed of June 1, 1854. We are of opinion, however, that *Gerrish* v. *Gary* is not fatal to this contention. *Gerrish* v. *Gary* was a case in which the proprietor of the upland adjoining the land conveyed by the deed of June 1, 1854,

on the east, claimed that the flats between high and low water mark should be divided between him and Gary according to the general rule, namely, by a line extended at right angles to the general course of the shore at high water mark. A line so drawn would have run from the stone bound in the side line of the Penny Ferry lot at high water mark northwest at an angle of seventy degrees with the southeasterly boundary line of the Penny Ferry lot given in that deed.

The land described in the amended declaration in *Gerrish* v. *Gary* was triangular in shape and was bounded on the southeast by the southeasterly boundary line of the Penny Ferry lot given in the deed of June 1, 1854; on the west, by low water mark, and on the north by the line run according to the general rule at right angles with the general course of the shore. The issue in that case was whether the land described in the writ belonged to the demandant. It was held that it did not. The question in that case was whether the line drawn at right angles to the general course of the shore, or the boundary of the Penny Ferry lot, was the line of division of the flats at this point, and it was decided that it was the latter. The demandant assumed that the southeasterly boundary of the Penny Ferry lot given in the deed of June 1, 1854, was the boundary of that lot, and that that lot did not extend beyond that line, and that no flats beyond that line were conveyed by the deed of December 19, 1854; and demanded the flats lying northwest of that line only. It was held that the flats demanded belonged to the tenant. It is consistent with that decision that the tenant owned more on the southeast than the demandant claimed in his writ, because the true boundary of the Penny Ferry lot was not that given in the deed of June 1, 1854; the true boundary of the Penny Ferry lot on the southeast was not in issue, and for that reason it may at least be doubted whether the statement by the court in *Gerrish* v. *Gary* as to the boundary line on the southeast is decisive of the rights of the parties. However that may be, it appears from the original papers in *Gerrish* v. *Gary* that John Gary was the sole person impleaded as tenant, and that Amos and Phineas Stone were not parties to that suit. The writ is dated October 3, 1864, and on October 3, 1864, Gary owned only one quarter of the land conveyed to him by the city of Charlestown in 1854, and the

legal title to only one quarter thereof stood in his name.  Under these circumstances, it would seem that Amos and Phineas Stone at least were not concluded by the decision in *Gerrish* v. *Gary* if that case can be taken as concluding anybody, as to the south-easterly boundary line of the Penny Ferry lot.  We are of opinion that it does not lie in the mouths of the defendants, Joseph Stone and his associates, who are claiming to hold land southeast of the boundary line between Boston and Everett under the deed of December 19, 1854, to claim that that deed did not operate on land in the town of Everett.

This disposes of the defendant's main contention, that the release of February 1, 1880, applies to the land conveyed by the deed of June 1, 1854; his main contention on that point was that the land described in the deed of December 19, 1854, was not described as lying in Charlestown and in Everett, while the land described in the deed of June 1, 1854, was so described. When it is established that part of the flats covered by the deed of December 19, 1854, were in fact in Charlestown, and that the grantees still claim that flats in Everett did pass under it, that argument falls to the ground.

The other grounds on which the defendant contends that· the release of 1880 covers the land described in the deed of June 1, and not that described in the deed of December 19, are : First, that it is a parcel formerly conveyed by Gary to P. J. Stone ; but that is equally true of both parcels ; the deed of May 1, 1856, conveys to Phineas one undivided half of the land conveyed by the deed of June 1, 1854, and also one undivided half of the land and flats conveyed by the deed of December 19, 1854.   Second, that it is a parcel formerly conveyed by the city of Charlestown to Gary ; that is equally true of both parcels. Third, that the release speaks of purchase money being paid and of improvements made ; so far as the release of February 1, 1880, implies that there was separate purchase money for the land described in the deed of December 19, 1854, it does not fit the facts ; so far as improvements are concerned, we have already alluded to the pile wharf built outside of low water mark in the years 1857 and 1858 ; that was an improvement on land covered by the deed of December 19, 1854.   Fourth, it is argued that the land conveyed by the deed of December 19,

1854, was land adjoining Malden Bridge, and the land in Everett which it is contended was conveyed by that deed adjoins the Penny Ferry lot and is separated from Malden Bridge by the width of that lot. But it is not true that the only land conveyed by the deed of December 19 was land adjoining Malden Bridge. The final clause of the deed covers land adjoining the Penny Ferry lot as well as land adjoining the bridge; the final clause conveys " all the land and flats if any there be, which formerly belonged to said Penny Ferry situated southerly of said line above described [the southeasterly boundary line of the Penny Ferry lot in the deed of June 1, 1854] and easterly of said Bridge." Fifth, it is also objected that, according to the plaintiff's contention, flats passed by the deed of December 19, and what is spoken of in the release dated February 1, 1880, is " a parcel of land." So far as that is concerned, flats are land and are not improperly described as such. And finally, sixth, that P. J. Stone did not own half the land described in the deed of December 19, 1854, at the date of the release in 1880. That is true; but it is equally true that he did not own one half the land covered by the deed of June 1, 1854. He had conveyed at least one third of one half of the land and flats covered by both deeds to Sewall, and that deed in terms covers both the land conveyed by the deed of June 1 and the land conveyed by the deed of December 19.

This case is not like the cases of *Cassidy* v. *Charlestown Five Cents Savings Bank*, 149 Mass. 325; *Dow* v. *Whitney*, 147 Mass. 1; *Lovejoy* v. *Lovett*, 124 Mass. 270, relied on by the defendant. In those cases, a parcel of land is described at length, and then follows a clause stating in substance that they are the same premises as those described in a prior deed, which deed did not convey the premises described. In this case, on the contrary, the only description of the land conveyed is that it is the land covered by the prior deed.

If any of the matters to which we have adverted make the deed of December 19, 1854, ambiguous, then the question arises whether the improbability of Amos conveying his interest in the flats covered by the deed of December 19, 1854, and keeping his interest in the land conveyed by the deed of June 1, 1854, is so great as to overcome the other facts in evidence, namely,

(1) that the land conveyed is described as the land covered by the deed of December 19 ; (2) that after the date of this release of February 1, 1880, no change was made in the treatment of the property; (3) that after that date, as before it, Amos was treated as the owner of one quarter interest for the eleven years during which his brother Phineas, the father of the defendant Joseph Stone, lived, and for the four years after the death of Phineas during which Phineas' clerk was living, and finally, (4) that in 1891, the defendant Joseph, being duly authorized by the owners, Phineas J. Stone one quarter interest, Amos Stone one quarter interest, and others, offered a part of this land for sale — the question whether, under these circumstances, it would be held that the release of February 1, 1880, ever took effect, is not now before the court. What is before the court is, Whether, on all the evidence, there is enough to overcome the express provision in the release of February 1, 1880, that it applies to the land described in the deed of December 19, 1854; and we are of opinion that there is not.

For the same reasons, we are of opinion that the recitals in the release of February, 1880, do not overcome the conclusion which we have heretofore stated, that between May, 1856, and October, 1863, Phineas made a deed to Amos of his one third of the one half of the legal title which was conveyed to Phineas by Gary. In the first place, the verbal agreement recited in the release of February, 1880, does not fit the facts ; that is an agreement by Phineas to convey " an undivided half part of his interest" on Amos paying " one-half of the purchase money " ; that is to say, on Amos paying one half of the purchase money for one half, he is to convey one half of one half. So far as the half interest conveyed to Phineas by Gary is concerned, Amos was to have one third, and although ultimately Amos was to have one quarter, that one quarter was not to be carved out of an interest conveyed to Phineas; one quarter of the whole was conveyed to Amos by Howland, and after he conveyed to Phineas and Sewall one twelfth each, he had one twelfth left in himself which, together with Amos' one third of the one half conveyed to Phineas made up his one quarter. In the second place, in February, 1880, Phineas was not possessed of one half, under any possible theory ; he had the legal title to five twelfths

if no conveyance of Amos' one third of one half had been made, and the legal title to one quarter if that conveyance had been made. In the third place, Phineas never paid out any purchase money, either for the land covered by the deed of June 1, 1854, or for that described in the deed of December 19, 1854. It is found by the master, who had books, papers, and accounts before him which are not all of them annexed to the report, that " no valuable consideration was paid by Gary, but that the mortgage which he gave the city was for the whole consideration, so that no money payment was made by him. Nor do I find that any payment has been made by him or any of his grantees towards the extinguishment of the mortgage debt, except such sums as have been received from a conveyance by Gary of a part of said premises, . . . and also such sums as have been received from the rents and profits of . the estate."

For these reasons, in view of the facts already dwelt on at length, we are of opinion that the release of February 1, 1880, if it ever took effect at all, applied to the flats covered by the deed of December 19, 1854, and not to the land described in the deed of June 1, 1854.

> *Order overruling defendants' exceptions to the master's report and decree for the plaintiffs affirmed.*